USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  __12/23/2025__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

PURDUE PHARMA L.P., *et al.*,

Debtors.[1]

ASCENT PHARMACEUTICALS, INC.,

Plaintiff/Appellant,

-against-

PURDUE PHARMA L.P., P.F.
LABORATORIES, INC., PURDUE
PHARMACEUTICALS L.P., PURDUE
PHARMA TECHNOLOGIES, INC. and
RHODES TECHNOLOGIES,

Defendants/Appellees.

Chapter 11

Case No. 19-23649 (SHL)

Adv. Pro. No. 22-07029 (SHL)

24 CV 6166 (NSR)

OPINION & ORDER

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge

This appeal arises from the Bankruptcy Court's June 14, 2024 Decision and Order (Adv. Pro. Dkt. 33 & 36[2], Bankruptcy ("Bankr.") Decision & Order), which granted Defendants–Appellees' motion to dismiss the adversary complaint filed by Plaintiff–Appellant Ascent

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

[2] In this Opinion, references to the Bankruptcy Court docket are cited as "Adv. Pro. Dkt.," while references to the S.D.N.Y. docket are cited as "ECF No."

Pharmaceuticals, Inc. ("Ascent" or "Appellant"). The Defendants-Appellees are Purdue Pharma L.P. ("PPLP"), Purdue Pharmaceuticals L.P. ("Purdue Pharmaceuticals"), and Rhodes Technologies ("Rhodes," and collectively, the "Debtor–Defendants"), as well as P.F. Laboratories, Inc. ("P.F. Labs") and Purdue Pharma Technologies Inc. ("PPT," and together with P.F. Labs, the "IAC Defendants".) Collectively, the Debtor–Defendants and the IAC Defendants are referred to herein as "Purdue".

Ascent filed this appeal on August 14, 2024. (Adv. Pro. Dkt. 38.) For the reasons set forth below, the Bankruptcy Court's Order is AFFIRMED in its entirety.

## BACKGROUND

### A. Factual Background

The following facts are drawn from the Court's review of the Bankruptcy Court docket and its Memorandum of Decision.

Purdue Pharma L.P. ("PPLP") and its affiliates (collectively, "Purdue") are debtors and debtors in possession in the above-captioned, jointly administered bankruptcy proceedings. They operate a prescription medication business. As part of that business, Purdue owns or licenses a number of patents, including patents related to opioid products. (*See* Adv. Pro. Dkt. 1, Complaint ("Compl.") ¶¶ 27, 34.) Ascent is an opioid manufacturer that specializes in producing and selling generic versions of other companies' pharmaceutical products. (*Id*. ¶¶ 24–26.)

In 2010, Purdue obtained approval from the United States Food and Drug Administration ("FDA") for certain oxycodone products that relied on its patented technologies (the "Purdue Patents"), under New Drug Application ("NDA") No. 022272 (the "Purdue NDA"). (Compl. ¶ 23.) In 2017, Ascent submitted an Abbreviated New Drug Application ("ANDA") No. 211178 (the "Ascent ANDA"), seeking FDA approval to market its own oxycodone products that would

rely on the Purdue Patents and serve as generic equivalents of the products covered by the Purdue NDA (the "Ascent Products"). (*Id.* ¶ 27.) Following Ascent's submission, Purdue initiated litigation in the United States District Court for the District of Delaware, alleging that Ascent's ANDA infringed on the Purdue Patents. (*Id.* ¶¶ 28–29.) Purdue sought a judicial determination on the validity and enforceability of those patents. (*Id.*)

On March 27, 2019, Purdue and Ascent[3] entered into three agreements: (1) a settlement agreement resolving the patent litigation (the "Settlement Agreement"); (2) a distribution and supply agreement allowing Ascent to distribute and sell certain Purdue products through the end of 2022 (the "Distribution and Supply Agreement" or "DSA"); and (3) a patent license agreement under which Ascent would begin manufacturing and selling generic versions of certain Purdue products beginning in 2023 (the "Patent License Agreement" or "PLA"). (*See* Compl. ¶ 7, Ex. A–C.[4]) Entry into these agreements resolved the pending civil actions and set forth the terms governing, among other things, the manufacture, sale, and distribution of Purdue opioid products. (*Id.*) Both the DSA and PLA contained termination provisions. (DSA § 10.2; PLA § 11.)

The DSA, executed only between Ascent and PPLP[5], granted Ascent the option to distribute and sell certain Purdue opioid products in exchange for cost-of-goods, payments, and royalties for a term not extending beyond December 31, 2022, provided that specified conditions were satisfied. (Compl. ¶¶ 7 n.2., 38; *see also* DSA § 3.1.) Ascent could elect to operate under the

---

[3] Ascent corporate affiliates Hetero FZCO, an entity formed under the laws of the United Arab Emirates ("Hetero"); and Camber Pharmaceuticals, Inc., a Delaware corporation ("Camber"), (collectively with Ascent, the "Ascent Entities") are parties to the Settlement Agreement, but not the DSA or PLA.

[4] The Settlement Agreement was annexed as Exhibit A to the Complaint, the DSA was annexed as Exhibit B to the Complaint, and the PLA was annexed as Exhibit C to the Complaint. Citations to the Agreements will refer to the name of the document, rather than the Exhibit, i.e. DSA §.

[5] PPLP was the sole counterparty to the DSA while "Purdue"—a collective reference to PPLP and its affiliated debtor entities—was the contracting party under the PLA. *See* Bankr. Decision at 4–6; Compl. ¶ 7 n.2.) Thus, where Ascent's claims concern alleged failures to supply product under the DSA, references to "PPLP" are appropriate; where they concern termination of the PLA, the use of "Purdue" reflects the collective contracting parties' role in exercising termination rights under that agreement.

DSA by providing written notice to PPLP by October 1 of the preceding year; otherwise, the DSA would terminate, and the PLA would govern. (*Id.* ¶ 39; *see also* DSA § 2.1.1.) Accordingly, Ascent was required to provide written notice to PPLP by October 1, 2020, if it elected to operate under the DSA for the calendar year beginning January 1, 2021. (*Id.*) Similarly, Ascent was required to provide notice by October 1, 2021, if it elected to operate under the DSA for the calendar year commencing January 1, 2022. (*Id.*) If Ascent did not provide such notice for 2022, the DSA would terminate on December 31, 2021. (*Id.*)

Under the DSA, PPLP agreed to supply Ascent with a defined quantity of inventory for resale, and Ascent was required to pay PPLP a royalty equal to ten percent of its net sales, subject to adjustments under enumerated conditions. (*See* DSA §§ 3.1.1, 4.1.) Each royalty payment was to be accompanied by a certificate verifying the quantity of inventory sold. (*Id.*) Upon Ascent's non-election or termination of the DSA, the PLA would automatically govern beginning January 1 of the following year. (Compl. ¶¶ 50–51.)

The PLA granted Ascent a non-exclusive, royalty-bearing, non-transferable license (the "License") under certain Purdue Patents. (*See* Compl. ¶ 50.) The License allowed Ascent to manufacture, market, and sell generic versions of Purdue opioid products in exchange for royalties and authorized Ascent to sell a defined quantity of Ascent Products that would gradually increase over time. (*Id.* ¶ 52; *see also* PLA § 2(b).) As with the DSA, Ascent was required to pay PPLP a royalty equal to ten percent of net sales made under the license, subject to certain adjustments. (PLA § 3(a).) The term and quantity of the License were contingent upon FDA approval of the Ascent ANDA by October 1 of the year preceding the applicable License Year. [6] (PLA §§ 2, 8.)

---

[6] If the Ascent ANDA received FDA Approval prior to October 1, 2020, then the License would commence January 1, 2021. If the Ascent ANDA was approved on or after October 1, 2020, but before October 1, 2021, the License would commence on January 1, 2022. If the Ascent ANDA is approved after January 1 but prior to October 1 of any subsequent year, the License would commence on January 1 of the succeeding year after such approval, and if the

However, when the PLA was executed, the Ascent ANDA had not yet received either tentative or final FDA approval. (*Id.*)

By letter dated August 6, 2020 (the "2020 Notice"), Ascent notified PPLP that it was electing to proceed under the DSA. (Compl. ¶ 58.) The parties subsequently exchanged communications regarding supply calculations and pricing. (*Id.* ¶¶ 59–65.) PPLP invoiced Ascent for the 2021 supply on March 19, 2021, and Ascent paid the invoice on May 14, 2021, before the specified due date. (*Id.* ¶ 69.)

Ascent alleges that it made efforts to obtain a supply of drugs for 2022. (Compl. ¶¶ 70-71.) On January 7, 2022, Ascent emailed PPLP to initiate the procurement process for the 2022 supply year and requested data necessary to perform the supply calculations. (*Id.* ¶ 71.) Ascent also made commitments to its own customers based on its expectation of receiving inventory in 2022. (*Id.* ¶ 70.) PPLP initially stated that it would "get back to" Ascent but, on January 14, 2022, PPLP asserted that it could not fulfill the 2022 supply request because the DSA had automatically terminated on December 31, 2021. (*Id.* ¶¶ 72–73.)  Ascent disputed that assertion, maintaining that its 2020 Notice applied to both 2021 and 2022, and contending that PPLP failed to meet its own timing obligations under the DSA. (*Id.* ¶ 75.)

Nevertheless, Ascent's counsel informed PPLP that it would be willing to accept delivery from PPLP in March or April 2022. (Compl. ¶ 76.) PPLP, however, in a letter dated February 3, 2022, advised that it would not supply product for 2022 and asserted that Ascent was in default for failing to both make royalty payments and provide the royalty certificate required under § 4.1 of the DSA. (*Id.* ¶¶ 77–78.) PPLP also reserved its right to terminate the PLA based on Ascent's breach of Article IV of the DSA. (*Id.* ¶ 80.) Ascent made a royalty payment by wire on February 28, 2022,

Ascent ANDA is approved on or after October 1 of any subsequent year, the License would commence on January 1 of the second succeeding year after such approval. PLA § 2(b).

but did not send the royalty certificate until March 9, 2022, with the delay caused by Ascent's CFO being out of the country due to a family emergency. (*Id.* ¶¶ 81–82.)  By letter dated April 6, 2022, PPLP asserted that the royalty certificate was deficient, declared that Ascent had materially breached the DSA (to the extent it had not already lapsed on December 31, 2021), and stated that it was terminating the PLA based on the asserted breach of Article IV of the DSA. (*Id.* ¶¶ 84, 86.)

### B.  Procedural History

In September 2019, Purdue filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code (the "Chapter 11 Cases"). (*See* Petition, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Sept. 16, 2019).) The Chapter 11 Cases remain pending. [7]

On June 16, 2022, Ascent filed a sealed adversary complaint asserting four causes of action: (i) a declaratory judgment that the DSA remains in full force and effect; (ii) a declaratory judgment that the PLA remains in full force and effect; (iii) breach of contract under the DSA based on PPLP's failure to supply product to Ascent in 2022, seeking specific performance or, alternatively, damages; and (iv) breach of contract under the PLA based on Purdue's termination of the same, seeking specific performance or, alternatively, damages. (*See* Compl. ¶¶ 88–123.)

On August 19, 2022, the Debtor–Defendants moved to dismiss the adversary complaint pursuant to Rule 12(b)(6)[8] and subsequently filed a memorandum of law in support. (*See* Adv. Pro. Dkt. 16 ("Mot."), Adv. Pro. Dkt. 17.) The IAC Defendants also filed a joinder in support of the motion. (*See* Adv. Pro. Dkt. 19.) In their motion, the Debtor–Defendants advanced two

---

[7] In May 2023, the Second Circuit issued a decision affirming the bankruptcy court's approval of Purdue's chapter 11 plan and remanding the case to the district court. *See In re Purdue Pharma, L.P.*, 635 B.R. 26 (S.D.N.Y. 2021), *rev'd and remanded sub nom. In Re Purdue Pharma L.P.*, 69 F.4th 45 (2d Cir. 2023). In August 2023, the Supreme Court of the United States granted the United States Trustee's application for stay and petition for a writ of certiorari. *See Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 44, 216 L. Ed. 2d 1300 (2023). The Supreme Court has not ruled on the appeal.

[8] Rule 12(b)(6) of the Federal Rules of Civil Procedure, as incorporated by Federal Rule of Bankruptcy Procedure 7012, permits dismissal for failure to state a claim upon which relief can be granted. *See* Fed. R. Bankr. P. 7012.

principal arguments: first, that the DSA and PLA had been terminated—either automatically under their own terms or as a result of Ascent's breaches; and second, that a non-debtor entity cannot enforce an executory contract against a Chapter 11 debtor prior to assumption, and that Purdue had not assumed any of the agreements. (*See generally* Mot.) Ascent opposed the dismissal motion, contending that both the DSA and PLA remain in effect and that its actions were not objectively unreasonable under the circumstances. (*See* Adv. Pro. Dkt. 22.) The Defendants filed replies in further support of their dismissal motion, including the Debtor–Defendants' Reply (*see* Adv. Pro. Dkt. 27) and the IAC Defendants' Joinder (*see* Adv. Pro. Dkt. 28).

In its Memorandum of Decision dated June 14, 2024, the Bankruptcy Court granted the Defendants' motion to dismiss.[9] (*See generally* Bankr. Decision.) The court concluded that Ascent had breached both the DSA and the PLA, and that Purdue properly terminated the agreements. (*See id.* at 12–16.) Specifically, the court found that Ascent failed to provide proper written notice of its election to operate under the DSA for the 2022 calendar year, as required by the agreement's express provision mandating separate annual notice. (*Id.* at 12–13.) The court further determined that Ascent's failure to make timely royalty payments and submit royalty certificates constituted material breaches, entitling Purdue to terminate the DSA and PLA agreements. (*Id.* at 15–16.) In so holding, the court agreed with Purdue's position that royalty obligations were "fundamental" to the DSA and that the "essence" of the agreement was the distribution of Purdue's products in exchange for royalty payments. (*Id.* at 15.)

Ascent filed this appeal on August 14, 2024 (ECF No. 1, C.A. No. 24-cv-6166) and filed its opening brief on October 10, 2024 (ECF No. 10, Ascent Brief ("Br.")). Purdue filed its

---

[9] A Motion to Dismiss pursuant to Federal Rules of Procedure 12(b)(6) is made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7012.

Opposition on November 12, 2024 (ECF No. 16, Purdue Brief, ("Purdue Br.")), and Ascent filed its Reply on November 26, 2024 (ECF No. 18, Ascent Reply)).

## STANDARD OF REVIEW

A district court hearing an appeal from a bankruptcy court reviews the bankruptcy court's findings of fact under the "clearly erroneous" standard, *see* Fed. R. Bankr. P. 8013, while its conclusions of law are reviewed under the *de novo* standard. *See In re Bennett Funding Group, Inc.,* 146 F.3d 136, 137 (2d Cir. 1998). Under *de novo* review, the Court affords no deference to the Bankruptcy Court's decision and decides the question as if no decision had been previously rendered. *See In re Reilly*, 245 B.R. 768, 772 (2d Cir. BAP), *aff'd*, 242 F.3d 367 (2d Cir. 2000) ("A *de novo* review allows us to decide the issue as if no decision had been previously rendered .... No deference is given to the Bankruptcy Court's decision.") (quoting *In re Miner*, 229 B.R. 561, 565 (2d Cir. BAP 1999)).

By contrast, review for clear error is much more deferential to the Bankruptcy Court's findings. Clear error exists "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Dist. Lodge 26, Int'l Ass'n of Machinists & Aerospace Workers, AFL–CIO v. United Techs. Corp.*, 610 F.3d 44, 51 (2d Cir. 2010) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). While the lower court's findings of fact are not conclusive on appeal, the party that seeks to overturn them bears a heavy burden. "To be clearly erroneous, a decision must strike [us] as more than just maybe or probably wrong; it must ... strike [us] as wrong with the force of a five-week-old, unrefrigerated dead fish." *In re Reilly*, 245 B.R. at 772 (quoting *In re Miner*, 229 B.R. at 565). "Particular deference is given to a bankruptcy court's findings on credibility." *In re*

*Portaluppi*, 609 F. App.'x 30, 31 (2d Cir. 2015) (citing *In re CBI Holding Co.*, 529 F.3d 432, 450 (2d Cir. 2008)).

The court reviews mixed questions of law and fact either *de novo* or under the clearly erroneous standard depending on whether the question is predominantly legal or factual. *Bay Harbour Mgmt., L.C. v. Lehman Bros. Holdings Inc.*, 415 B.R. 77, 83 (S.D.N.Y. 2009) (internal quotation and citation omitted); *In re Gordon*, 577 B.R. 38, 49 (S.D.N.Y. 2017) ("Bankruptcy courts have the discretion to decide an issue without holding an evidentiary hearing, and a district court can reverse such a decision only if it amounts to an abuse of discretion.").

## DISCUSSION

Ascent appeals the Bankruptcy Court's order granting Defendants' Motion to Dismiss, contending that the court erred in concluding that Purdue properly terminated the DSA and PLA. Specifically, Ascent contends that the Bankruptcy Court erred in finding: (i) that the DSA automatically terminated at the end of 2021 because Ascent failed to provide timely and proper notice of its intent to continue operating under the DSA for 2022 (Bankr. Decision at 12–13); (ii) that Ascent's failure to make royalty payments or provide royalty certificates constituted material breaches, and its failure to cure those breaches after receiving Purdue's termination notice entitled Purdue to terminate the DSA (*id*. at 14–16); (iii) that Purdue validly terminated the PLA based on Ascent's breach of the DSA (*id*. at 16); and (iv) that the adversary complaint should be dismissed with prejudice (*id*. at 18–19).

**A. The Bankruptcy Court Properly Found that Purdue Terminated the DSA**

   *i.*       *The Bankruptcy Court Correctly Concluded that the DSA Automatically Terminated on December 31, 2021, When Ascent Failed to Provide the Second Written Notice Required by the Agreement*

9

The Bankruptcy Court correctly held that the DSA terminated automatically on December 31, 2021, because Ascent failed to deliver the second written notice expressly required by § 2.1.1 of the DSA. (Bankr. Decision at 12–13.) Ascent itself conceded that it did not provide a separate written notice for 2022, relying instead on its August 2020 email as purported notice for both years. (Ascent Br. at 18-19, 22.) Under Delaware law, clear and unambiguous contract language controls and must be enforced as written. *Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021) ("Delaware courts … will give effect to the plain meaning of the contract's terms and provisions" when the "contract is clear and unambiguous."); *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012) ("The Court will interpret clear and unambiguous terms according to their ordinary meaning."). The DSA's § 10.1 defines the "Selling Termination Date" as "(i) December 31, 2021, or (ii) December 31, 2022 if [Ascent] provides the second notice to Purdue set forth in Section 2.1.1." (Bankr. Decision at 12.) Section 2.1.1 reinforces this structure, stating that if Ascent fails to provide written notice for 2022 by October 1, 2021, "this Agreement will terminate on December 31, 2021." (*Id.* at 12–13.) Together, these provisions establish two distinct election periods: Ascent first had to elect to operate under the DSA for 2021, and only then could it separately elect to continue for 2022. Nothing in the text suggests that a single notice would suffice for both years. Reading the 2020 email as dual notice would erase § 2.1.1's second-notice requirement, contrary to Delaware's settled rule that contracts must be read to give effect to every clause. *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (requiring courts to give each contractual provision independent meaning). Accordingly, because the DSA's plain language required a second written notice to extend the agreement beyond 2021, the Bankruptcy Court correctly held that the DSA automatically terminated on December 31, 2021.

Ascent's course-of-performance argument does not alter this conclusion. Ascent contends that it did not breach the DSA because both parties deviated from the contract's schedule, asserting that Purdue's own delays in calculating the 2021 product supply under § 3.1.1 reflected a mutual understanding that strict adherence to deadlines was unnecessary. (Purdue Br. at 22.) From this, Ascent claims that the parties effectively waived or modified the DSA's timing provisions, but § 11.4 of the DSA expressly forecloses any implied modification or waiver through conduct, providing that no term "may be waived or modified except by a written instrument executed by the waiving party." (Bankr. Decision at 15.) Ascent identifies no such written waiver, and that omission is dispositive. Delaware law enforces clear "no-waiver" clauses and rejects attempts to imply modification of express conditions through informal practice. *See Nucor Coatings Corp. v. Precoat Metals Corp.,* No. N22C-11-222 MAA CCLD, 2023 WL 6368316, at *13 (Del. Super. Ct. Aug. 31, 2023) (holding that a contract's no-waiver clause was unambiguous and enforceable.) *Aveanna Healthcare, LLC v. Epic/Freedom, LLC*, No. CVN20C08055AMLCCLD, 2021 WL 3235739, at *11 (Del. Super. Ct. July 29, 2021) (the contract's unambiguous "No Waiver" language undermined Plaintiff's waiver arguments.) As the Bankruptcy Court correctly observed, "no alleged delay in 2021 performance altered Ascent's obligation to provide the second notice." (Bankr. Decision at 13–14.) The DSA's clear and unequivocal language—not the parties' subsequent conduct—controls. Accordingly, Ascent's failure to provide the second written notice caused the DSA to terminate automatically on December 31, 2021. Because the agreement expressly precludes implied waiver or modification, Ascent's "course of performance" theory is unavailing.

    ii.    *The Bankruptcy Court Properly Found That Ascent's Uncured Royalty Default Constituted a Material Breach*

Even assuming, arguendo, that the DSA remained in effect despite Ascent's failure to provide the required 2022 notice, the Bankruptcy Court correctly found that Ascent's uncured royalty default constituted a material breach warranting termination. (Bankr. Decision at 15–16.) Under Delaware law, "a breach must go to the root of the parties' agreement to be material." *eCommerce Indus., Inc. v. MWA Intel., Inc.*, No. CV 7471–VCP, 2013 WL 5621678, at *17 (Del. Ch. Sept. 30, 2013). Where the breach involves failure to pay royalties—the central consideration of the agreement—materiality may be decided as a matter of law. *IGEN Int'l, Inc. v. Roche Diagnostics GmbH, 335 F.3d 303, 315* (4th Cir. 2003) (finding that under Delaware law "failure to properly pay royalties or its breach of the field restrictions was material"). The Bankruptcy Court identified two breaches: Ascent's failure to 1) make the required royalty payments and 2) provide the accompanying royalty certificates. (Bankr. Decision at 15–16.) Ascent contends that these breaches were "minor" and "immaterial." (Ascent Br. at 22.) The Court, in alignment with the Bankruptcy Court's ruling, finds otherwise.

Both breaches were material because they went to the heart of the parties' exchange—PPLP supplied inventory for Ascent to sell, and Ascent, in turn, was required to pay a ten-percent royalty on its net sales and submit royalty certificates verifying the amounts due. (DSA §§ 3.1.1, 4.1, Purdue Br. at 38.) These reciprocal obligations defined the consideration that sustained the DSA; without payment, the commercial purpose of the agreement failed. The DSA required Ascent to remit quarterly royalties "within thirty (30) days following the end of each Selling Quarter" and permitted termination if any default remained uncured thirty days after written notice. (DSA §10.2.) The record shows that Ascent made no royalty payments for 2021, received a February 3, 2022 notice of default, and was given until March 5 to cure. (Compl. ¶¶ 78–82.) Although Ascent wired the overdue payment on February 28, it did not provide the required royalty certificate until

12

March 9—four days late—because its CFO was abroad due to a family emergency. (*Id.*) While the Court is sympathetic to the CFO's emergency, the DSA's clear terms explicitly allowed only thirty days to cure, which Ascent failed to do. Accordingly, the Bankruptcy Court correctly found that Ascent's royalty obligations were "fundamental to the consideration PPLP received under the DSA" and that its failure to cure therefore "went to the essence of the agreement." (Bankr. Order at 15–16.) These obligations represented the economic foundation of the DSA—the means by which PPLP was compensated for granting Ascent the right to manufacture and sell its products. By failing both to timely pay and to verify those payments, Ascent deprived PPLP of its bargained-for consideration. Accordingly, Ascent's year-long nonpayment and untimely cure constituted a material breach warranting termination.

**B.  The Bankruptcy Court Correctly Upheld Purdue's Termination of the PLA**

The Bankruptcy Court correctly held that Purdue lawfully terminated the PLA. (Bankr. Decision at 16–17.) Under Delaware law, courts enforce termination provisions according to their plain terms and will not rewrite contracts to supply terms parties failed to obtain. *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010); *see also McDonald's Corp. v. Easterbrook*, No. CV 2020-0658-JRS, 2021 WL 351967, at *5 (Del. Ch. Feb. 2, 2021) ("Without this clear expression of intent, the Court has no cause to rewrite the [the agreement] to include commitments the parties themselves chose not to incorporate."). The PLA automatically took effect upon termination of the DSA on December 31, 2021. (PLA § 2(b).) The PLA's § 11 authorizes Purdue to terminate "in the event that Ascent breaches … Article IV of the [DSA]." (Bankr. Decision at 16.) Ascent's failure to make timely royalty payments under Article IV triggered that right. While Ascent contends that Purdue's termination was disproportionate, the contract expressly differentiates between the parties' termination rights: Purdue may terminate for *any* breach by Ascent of the enumerated

provisions, whereas Ascent may terminate only for a *material* breach by Purdue—an intentional allocation of risk between sophisticated parties. Delaware law gives full effect to such asymmetry and does not imply a materiality threshold where none exists. *See Asset Recovery Servs., Inc.,* 1999 WL 743479, at *11 (Del. Ch. Sept. 10, 1999) (determining that omission of a specific term in a contract "speaks volumes" about the parties' intent when construing included terms*.); see also Fortis Advisors LLC v. Shire US Holdings, Inc.,* 2017 WL 3420751, at *8 (Del. Ch. Aug. 9, 2017) (explaining that the parties' omission of specific contractual language reflected the canon *expressio unius est exclusio alterius*—that the inclusion of certain terms implies the intentional exclusion of others). Thus, the Bankruptcy Court properly found that Purdue acted within its express contractual rights and in good faith. (Bankr. Decision at 17.) Because the PLA expressly permits termination for any breach of Article IV, and Ascent's uncured default constituted such a breach, Purdue's April 6, 2022 termination was valid and effective.

### C. Remaining Arguments

The Court agrees with the Bankruptcy Court's determination that, having found both the DSA and PLA properly terminated, no further issues remain for adjudication. Once the Bankruptcy Court concluded that Ascent's uncured breaches triggered automatic termination under the express provisions of the agreements, it correctly held that there were no surviving contracts subject to assumption or rejection under the Bankruptcy Code. (Bankr. Decision at 18–19.) Because both agreements ceased to exist prior to the petition date, the Court does not need to reach the issue of whether Ascent improperly forced Purdue to assume the DSA and PLA. Therefore, the Bankruptcy Court properly held  "that Ascent is not entitled to any relief under the Complaint." (Bankr. Decision at 17.)

14

Finally, the Court agrees with the Bankruptcy Court that it need not reach the arguments advanced by the IAC Defendants. (*Id.*) Because the IAC Defendants had previously assigned all rights under the relevant patents to PPLP in April 2019, they possess no remaining interest in this dispute. (*Id.*) The dismissal of all claims against Purdue necessarily renders the IAC Defendants' separate arguments moot.

**D. The Bankruptcy Court Properly Dismissed the Adversary Complaint With Prejudice**

Lastly, the Bankruptcy Court properly dismissed Ascent's adversary complaint with prejudice because amendment would be futile in light of the clear contract language and Ascent's admitted defaults. (Bankr. Decision at 17–18.) Generally, leave to amend should be freely granted "when justice so requires," unless amendment would be futile. *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 55 (2d Cir. 1995); *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002). Here, Ascent's claims depend entirely on the continued validity of the DSA and PLA. But both agreements terminated automatically under their express terms, and the record leaves "no set of facts" that could alter that conclusion. (Bankr. Decision at 18.) Even accepting Ascent's allegations as true, no amendment could transform an expired contract into an operative one.

Nor can Ascent plausibly rely on discovery to resuscitate its claims. As the Bankruptcy Court observed, discovery cannot rewrite or contradict unambiguous contract terms. *See e.g. Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, 157 F. Supp. 3d 352, 365 (S.D.N.Y. 2016). Ascent's suggestion that additional facts might show waiver or non-materiality is foreclosed by the DSA's express no-waiver and integration clauses, which preclude reliance on extrinsic conduct to vary the contract's plain meaning. (Purdue Br. at 19–20.) Because Ascent's own admissions and the contracts' clear language conclusively establish termination and default, amendment would serve

15

no purpose other than to reassert legally deficient theories. The Bankruptcy Court thus acted well within its discretion in dismissing the adversary complaint with prejudice.

## CONCLUSION

For the reasons set forth above, the Court concludes that the Bankruptcy Court correctly determined that: (1) the DSA terminated under its plain terms; (2) Ascent's uncured nonpayment and failure to provide the royalty certificate constituted a material breach; (3) Purdue lawfully terminated the PLA; and (4) dismissal of Ascent's adversary complaint with prejudice was proper. Accordingly, the Bankruptcy Court's decision is AFFIRMED in its entirety. The Clerk of Court is directed to terminate the action. This constitutes the Court's Opinion and Order.

December 23, 2025
White Plains, New York

SO ORDERED:

NELSON S. ROMÁN
United States District Judge

16